## EDWARD JEREMY ET AL. v. MARY ELWELL.

1. IN ACTION FOR REMOVING OBSTRUCTION, QUESTION OF NAVIGABILITY IS ONE FOR JURY
   In an action for trespass for removing an obstruction placed across a stream by order of one who owns the land on both sides of the stream, the question whether said stream is navigable, and the obstruction, therefore, an unlawful hindrance to navigation, is one of fact for the jury, whose finding thereon will not be disturbed by a court of error, unless clearly and manifestly against the weight of the evidence.

2. QUESTION TO BE DETERMINED BY NATURAL CHARACTER OF THE STREAM.
   The question whether or not a stream is navigable, is to be determined by considering its natural character rather than the condition of its channel after the same has been cleaned out, deepened or widened under the provisions of the statutes to facilitate drainage.

3. DEDUCTION NOT PRESUMED BECAUSE OWNER ALLOWS FREQUENT USE BY PUBLIC.
   The dedication of a water course through private lands, for a public highway, will be presumed merely from its frequent use by the public without objection by the owner, during a period of more than twenty-one years, for the passage of row boats and other small crafts.

ERROR to the Court of Common Pleas of Ottawa county.

BENTLEY, J. (orally.)

Petition in error to reverse the judgment of the court of common pleas upon the verdict of the jury rendered in favor of Elwell against the plaintiff in error, in a suit brought by her against them for trespass in breaking down a fence. She alleges that they committed the trespass on August 14, 1888, to her damage $100. There was an answer filed, and afterwards an amended answer, which contained in its first defense the same averments as in the original answer, but adding a second defense. The first part of the answer sought to justify the alleged trespass by alleging that the fence in question had been wrongfully erected, and was standing in and across a public highway, and obstructed the same so that without breaking or removing some of the boards the defendants could not pass into and along the highway as they had a right to do.

They say, that in tearing the fence down, they did no more damage than was necessary. The second part of the answer substantially alleges that this fence in question was wrongfully erected across a stream by the name of "Beef Creek;" that the stream was navigable from Lake Erie to a point above the fence; that the creek had been used by the people in the vicinity for the passage of boats, with the knowledge and consent of the persons who owned the land, for more than twenty-one years next prior to the time of the alleged trespass. The reply is a general denial.

Upon these pleadings the case went to trial to a jury. Evidence was introduced by the plaintiff, and by the defendants and by the plaintiff in rebuttal, and it is presumed that at the close of the testimony the court properly charged the jury, as the court's charge is not set out in the bill of exceptions.

The jury brought in their verdict for a certain amount, which was cut down by the court to $2.50. A motion for a new trial was overruled, and a judgment rendered on the verdict for $2.50. The motion for a new trial simply complains of this verdict because it is not sustained by sufficient evidence, and is against the weight of the evidence.

And the only error now claimed to be exhibited on the record before us is, that the court of common pleas erred in refusing a new trial, because the verdict was not sustained by the evidence. The testimony is all set out. The question mainly is whether this stream called "Beef Creek" is or is not navigable? And if not strictly navigagble, whether it was so dedicated that the plaintiff below had no right to prevent persons from passing upon it? The rules under which a court of error must dispose of a case are well understood. It must appear, not only that the conclusion to which the jury came, was not such a one as the reviewing court would probably have arrived at, but that the verdict was clearly and manifestly against the evidence.

I have not time to go over the testimony in full. It is claimed on the part of the plaintiffs in error that this stream called "Beef Creek" emptied into the Tousaint river, and this is admitted. It appears that it ran through a swampy region where this construction was built across it. It is said by the plaintiffs in error that the record shows that this stream had been used for row boats and fish boats from a very early day, a period long anterior to 1863; that it had been constantly used for the passage of boats up to the time of its obstruction.

One of the statements of the first witness called in behalf of the plaintiffs in error, defendants below, was "that it was used by all the early settlers in that part of the country through which it passed." The same witness on cross-examination says: "The country was a wilderness. The country was all open, and people came and went wherever they pleased," etc.

Charles Winnie says "that he moved down the creek; that there came a north easter in 1863, and filled the creek up so that it was closed, and that afterwards the trustees made a ditch out of it. Ever since it has been used whenever the people had an occasion— sometimes up to the Wilkins' landing, sometimes up to the road. The head of the creek was the beaver dam, some distance above the obstruction in question."

George Young testified: "I used to go up and down there. Before I came away it was used generally. There has been times during the last 18 or 20 years that it would be impossible to go up there with a boat."

Tim. Perry testified: "When I lived up there the people used this creek as far as Wilkins' landing. In the winter time it was used as a road. This creek had been used by the people generally since I first knew it. I never knew of any objection being made to using it."

John Cover testified, speaking of this creek: "The people did not use the creek except when they were going that way. The creek did not always have enough water in to use. I don't remember of going down the creek in July or August. In the summer wild rice grows in it, and you cannot go up unless you get the wild rice out."

W. W. Montgomery testified: "Prior to three or four years ago, the creek was used by the people generally during the season that it could be used. I never knew of an objection to the use of this creek until this suit was begun. I think when I first came up there nobody was living on the creek. I think that Wilkins was the first one that lived on the creek. I never knew of any objection being made during all the time I lived there to going up this creek."

Peter Jeremy testified: "The water has been so low that it has been impossible to go up there. I have mowed rice out of there; I did that to keep from getting wet. There is for a short time in the summer that we have to clear out the creek every day."

Edward Jeremy testified: "I pulled some grass out of the river so that I could use my oars. There is enough water there today so that I can shove a cat-fish boat up to the road."

On the part of the plaintiff certain witnesses were called. George Rice says: "I cannot tell how much water there is in the creek, but it is not practical to use it at all times of the year. The river rises with the lake. I have gone over it dry-shod. I saw the stream last Saturday; it could not be used for boats."

Sam Cover testified: "I never saw any sand carried up there. There are three landings. I have seen the stream dry. Since the township ditch was dug there there is a channel there. From the mouth of the creek to the road it is 60 rods. I moved there in 1865. For a long time boats did not go up it. I never saw boats go up there in June. In June, 1861, there was not many people up there. The whole country was a wilderness."

George Long testified: "I came there 21 years ago last March. When I came there the land was not generally enclosed."

This gives some little idea of the scope of the testimony. It seems that the part of the creek in question, is about sixty rods long. There is no proof in the record of the width of the stream, as far as I have been able to see, except that in places it might be inferred from the width of a boat; but the width of the channel of the stream between its banks nowhere appears in the record. It is said by one of the defendants below, that his fish boat was two feet wide. It appears that at some time or other boats of larger dimensions have gone up there, but their width is not stated. And where it appears by record that larger boats have used it, their size does not appear, nor what the general stage of the water was, nor the season of the year. It is manifest that at times there is sufficient water to float boats of some size during a northeast wind when the water in the stream generally rises.

All the testimony went to this end; that it was a short and a very wide stream, growing up in the summer with wild rice; that while boats—flat-bottomed fish boats—could shove up there, they could not move freely, and during the summer seasons it was necessary to remove these obstructions of the creek.

And we are asked to say that sort of a stream is, as a matter of fact, navigable in such a way that the owner of the land on both sides of it has no right to obstruct it. We have looked at the Ohio authorities on this subject. In Hickok v. Hine, 23 O. S., 523, on page 527, the court say:

"Having no tidal waters in this state, the word navigable, as applied to our rivers, is not used in the technical sense of the common law; but is applied, as in a popular sense, to all rivers that are navigable in fact. A river is regarded as navigable which is capable of floating to market the produce of the country through which it passes, or upon which commerce can be conducted; and, from the fact of its being so navigable, it becomes in law a public river or highway. The character of a river, as such highway, is not so much determined by the frequency of its use for that purpose, as it is by its capacity of being used by the public for transportation and commerce."

This authority is to this point, that whether a certain stream is navigable or not is a question of fact, and not a question of law. It was then a question for the jury to determine the fact, whether this is a navigable stream. It is said that if this is not a navigable stream, after it had been used by the public for a number of years, with the knowledge and consent of the owners of the land, it must be held dedicated to the public for a highway. These two questions are closely connected, and one involved in the other. One cannot be said to have dedicated a piece of ground for a highway when it was incapable of use for that purpose. So the question comes back to us: Was this capable of being used as a highway? The acquiescence in some use of it could not be considered as a dedication of it for purposes for which it was not fit. And it appears, as I have said, that until late

379                                    Jeremy et al. v. Elwell.

years, all the country through which the creek flows·was waste ground, swampy, uninclosed, with inhabitants few and scattering. Under these circumstances, to hold that the owners of the land must be conclusively presumed, in the absence of testimony, to have known and to have acquiesced in such use of the stream as was made of it, we think would be going too far. Our attention has been called to a case in 54 Ill., 119, in which the supreme court of Illinois, in speaking of a case then before it, quote with approval what is said in 21 Pick., 344, and say:

> "It is not every small creek in which a fishing skiff or gunning canoe can be made to float at high water, which is deemed navigable. In order to have this character, it must be navigable to some purpose useful to trade or agriculture. It is not a mere possibility of being used under some circumstances, as at extraordinary high tides, which will give it the character of a navigable stream, but it must be general and commonly useful to some purpose of trade or agriculture. This cannot be alleged of " Big Creek." It cannot be said that a stream is generally and commonly useful to any purpose of trade or agriculture, that in its normal condition is a bed of sand and mud or gravel, diversified, perhaps, by pools of water left by subsiding floods, and separated from each other by sand banks. To say of such a stream, that it is generally and commonly useful for purposes of trade, is saying too much."

Now, whether this stream was navigable or not depends upon its character in a state of nature. If it was navigable in a state of nature, the cleaning of it out for a ditch, and deepening and widening it, would not render it less so; but if it was not so before, the cleaning it out so that it could be navigated by boats, would not make it navigable in the sense that passing over it could not lawfully be obstructed by the owners of the lands through which it runs. The condition of the creek before it was cleaned out by the township trustees, is a little difficult to determine by inspection of this record. Montgomery says that he knew it first in 1861; another witness testified that in 1863 the creek filled up so that it could not be navigated. So that of its condition prior to 1863 there is very little testimony to be found. We think that the jury was right in coming to the conclusion that it was not a navigable stream, and that there was no dedication of it for a highway.

The judgment of the court of common pleas is affirmed.

T. J. Marshall and Linn W. Hull, for plaintiffs in error.

M. Kelly and E. G. Love, for defendant in error.

---

385                        JUDGMENT—EXECUTION—TITLE.